FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

2003 DEC -8  P 4: 17

U.S. DISTRICT C...
NEW HAVEN, C...

SHERON ROSE,
       Plaintiff,

v.                                     CIVIL NO. 3:02CV1806(GLG)

PANOLAM INDUSTRIES
INTERNATIONAL INCORPORATED,
       Defendant.                      DECEMBER 5, 2003

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56 of this District, Plaintiff, Sheron Rose respectfully moves this Court for the entry of a denial of Defendant, Panolam Industries International, Inc.'s ("Panolam") motion for summary judgment dated September 30, 2003. There exist genuine issues of material fact with regard to this case, and Plaintiff can prevail on the allegations of her Complaint. Accordingly, Panolam is not entitled to judgment as a matter of law.

**I.**     **FACTUAL BACKGROUND**

    **A.**     **Plaintiff's Hiring**

Panolam manufactures Panolam™ ThermoFused Melamine (TFM) and Pionite® High-Pressure Laminate (HPL) decorative surfaces for use in commercial interiors, store fixtures, furniture, and other design surfaces. In 1999, Panolam purchased Pioneer Plastics, and the Pionite High-Pressure Laminate brand. The Panolam and Pionite sides of the business use different systems for pricing and customer information, as well as different accounting software. The Pionite business uses PeopleSoft, whereas the Panolam business

uses an accounting software called BPCS.

In May or June 2001, Plaintiff first interviewed with Mr. Jamie Hicks ("Mr. Hicks") followed by a second interview which included Mr. Marc Gordon. (Pl. Dep., pp.60-61.) Plaintiff was notified via phone that she was being offered the position of Accounts Receivable Clerk and later received a letter dated June 4, 2001 confirming the offer and acceptance and outlining the details of the position. (Pl. Dep., pp. 61-62; Shea Aff. Ex. 2.) The letter dated June 4, 2001 stated the details of the employment such as salary, an initial review program in place at Panolam, a one year performance evaluation, vacation benefits, company benefits, drug testing, at-will employment, and administrative procedures. (Shea Aff. Ex. 2.)

**B.    Plaintiff's Job Duties**

Plaintiff began working for Panolam as an Accounts Receivable Clerk on June 20, 2001. (Shea Aff. Ex. 2.) In addition to Plaintiff and Mr. Hicks, the Accounting Department consisted of four other individuals: Suzanne Lusteg ("Ms. Lusteg"), Accounts Receivable Clerk, Michelle Gambardella ("Ms. Gambardella"), Rebate Adjustment Clerk, Kathy Bubier ("Ms. Bubier"), Credit Analyst, and either Marc Gordon, then-Assistant Treasurer, or his replacement, Betty Dwyer. (Pl. Depo., pp. 66-67, 70; Hicks Aff., ¶ 5.) Plaintiff did not report to Ms. Lusteg, Ms. Gambardella, or Ms. Bubier; however, Plaintiff would approach Ms. Bubier if questions arose. (Pl. Depo., pp. 67-68.)

As an Accounts Receivable Clerk, Plaintiff was responsible for applying customer payments to the appropriate customer invoice, reconciling bank statements, and performing other basic accounting duties. (Pl. Depo., pp. 64-65.) Her primary functions

2

included identifying the appropriate customer, checking the customer's outstanding balance, applying the customer's payment to the balance and confirming that the customer's account had been credited with the appropriate amount. In performing these duties, Plaintiff worked primarily with a software program called BPCS. (Hicks Aff., ¶ 4; Pl. Depo., p. 75.) Plaintiff performed cash application duties for the Panolam side of the business. (Pl. Depo., p. 65.)

Plaintiff's co-workers, Ms. Lusteg and Ms. Gambardella, worked on the Pionite side of Panolam's business. (Hicks Aff., ¶ 6.) Ms. Lusteg performed the same type of similar cash application duties for Pionite as Plaintiff did for Panolam. (Pl. Dep., p. 66.) Ms. Lusteg and Ms. Bubier were both hired before Plaintiff. (Id., pp. 66-67.) Ms. Gambardella was hired after Plaintiff. (Id.)

As a Rebate Adjustment Clerk, Ms. Gambardella was responsible for working with the Marketing Department to apply rebates to customer invoices. The Marketing Department, in turn, administered the rebate program with distributors. When a customer submitted a rebate request, Ms. Gambardella was responsible for confirming that the request was valid, reviewing the request with the Marketing Department, and applying the rebate to the appropriate invoice. Ms. Gambardella did not perform cash application duties and worked with a different computer software program than Plaintiff. Ms. Gambardella was trained by the former Rebate Adjustment Clerk. (Hicks Aff. ¶ 6.)

C.   **Plaintiff's Training**

Mr. Hicks met with Plaintiff on her first day of work, gave her a binder with information relating to the software, and showed her how to use the software. (Pl. Depo., p.

3

71.) After the first day, Mr. Hicks provided no additional training. (Pl. Depo., pp. 84, 146, 158.) Mr. Hicks walked Plaintiff through one cash application on the computer software and then she was on her own. (Pl. Depo., p. 75.) Mr. Hicks was neither approachable nor available to answer questions. When Plaintiff would attempt to approach Mr. Hicks with a question, he would respond with profanity and foul language and would either get up and leave his office or ignore Plaintiff and return to his computer. Plaintiff would then approach Ms. Bubier with the question. (Pl. Depo., p. 91; Ex. A attached to Def. Memorandum ¶ 1.)

### D.    Plaintiff's Performance Problems

Plaintiff would perform her duties according to the usual procedures, such as allowing discounts for certain customers, then would be penalized for following prior procedure. (Pl. Depo., pp. 114-116.) At times Mr. Hicks would accuse Plaintiff of permitting an unauthorized discount and when he discovered that she had not made an error, he failed to offer an apology for his incorrect assumption. (Ex. A. attached to Def. Memorandum ¶ 10.) Mr. Hicks did not speak with Plaintiff with regard to any errors that may have occurred in following a banking report procedure, nor did Mr. Hicks review or provide a bank report procedure to the Plaintiff. (Pl. Depo., pp. 117-119.) Any errors that may have occurred involved typographical mistakes that were corrected according to policy and procedure with regard to Plaintiff's duties. (Pl. Depo., pp. 121-123.) Mr. Hicks did not have discussions with the Plaintiff with regard to her performance, and no memos were given to the Plaintiff to review. (Pl. Depo., pp. 109-125; Ex. A. attached to Def. Memorandum ¶ ¶19, 20.)

Mr. Hicks accused the Plaintiff of being unable to speak generally and accused

4

her of not using proper English in the presence of other co-workers. (Pl. Depo., pp. 132-134.) The comments from Mr. Hicks with regard to the manner in which Plaintiff spoke caused her to feel bad and embarrassed. (Pl. Depo., p. 133.) When Mr. Hicks removed Plaintiff's phone responsibilities due to his distaste for her speech, he refused to assign additional duties which Plaintiff requested, and chose to complain to Plaintiff that he was assigning too much work to Ms. Bubier. (Ex. A. attached to Def. Memorandum ¶ 7.) No other employees or customers ever stated that they were unable to understand Plaintiff's notes or speech. (Id. ¶ 5.)

### E.  Termination of Plaintiff's Employment

On March 8, 2002, Mr. Hicks and Sharon Metz ("Ms. Metz"), Corporate Human Resources Manager, met with Plaintiff and notified her that her employment was terminated for unsatisfactory performance. (Pl. Depo., p. 127.) During their meeting, Plaintiff was given information regarding the continuation of her medical benefits and release forms to be signed. (Pl. Depo., pp. 127-129.)

After the meeting, Mr. Hicks escorted the Plaintiff to her desk to collect her personal items and then to the door. (Pl. Depo., p. 130.)

## II.  PROCEDURAL HISTORY

On March 25, 2002, Plaintiff filed an administrative charge with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC") alleging race, color and national origin discrimination. (Ex. B attached to Def. Memorandum.) Plaintiff filed an amended complaint, which was mailed to Panolam on April 24, 2002 (Id.) On May 3, 2002, Panolam filed its

response to Plaintiff's CHRO charge. (Ex. 1 attached hereto: Panolam's Response.) On or about May 14, 2002, Plaintiff filed her Reply to Respondent's Answer. (Ex. A attached to Def. Motion for Summary Judgment.) On June 24, 2002, the CHRO dismissed Plaintiff's charge and on January 17, 2003, Plaintiff received a right to sue letter from the EEOC. (Ex. D attached to Def. Memorandum.)

III.   **ANALYSIS AND ARGUMENT**

   A.   **Summary Judgment Standard**

   Federal Rule of Civil Procedure 56(c) in relevant part states that "The [summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admission on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."

   However, where the court, <u>in viewing the factual record in a light most favorable to the non-moving party</u> [i.e. at bar, the plaintiff] determines that <u>any pertinent factual controversy exists, which should be tried</u>, summary judgment should be denied. <u>Exxon Corp. v. FTC</u>, 636 F.2d 120 (1980) [emphasis added].

   Since summary judgment is an extreme remedy, the Court should not grant it unless the moving party has established a right to judgment with such clarity as to leave no room for controversy and that the non-moving party is not entitled to recover under any discernible circumstances. <u>Mandel v. U.S.</u>, 719 F.2d 963 (C.A. Ark 1982).

   As noted herein above, summary judgment also should not be granted unless it

6

is found that the moving party is entitled to judgment as a matter of law. As a general rule, summary judgment may be granted where the sole issues for determination are issues of law. Spark v. Catholic University of America, 510 F.2d 1277 (App. D.C. 1975); Battle v. Travelers Ins. Co., 15 FRD 239 (D.C.M.J. 1954); Indian Lake Estate, Inc. v. Lichtman, 311 F.2d (A.P.R.C.D. 1962). Moreover, it is the moving party who must show that it is entitled to judgment as a matter of law. Robinson v. Magovern, 456 F.Supp. 1000 (D.C., Pa. 1978).

In ruling on a Motion for Summary Judgment, the Court's function is not to decide issues of material fact, but rather to determine whether any such issues exist. "[O]nly when reasonable minds could not differ as to the import of the evidence is Summary Judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted).

It is generally an accepted rule of law that summary judgment is inappropriate where an individual's intent or state of mind are at issue and/or implicated. Patrick v. Lefevre, 745 F.2d 153, 159 (2d Cir. 1984).

The plaintiff has an "obligation to satisfy federal notice pleading requirements and allege more than bare assertions of legal conclusions." Orick v. Banziger, 945 F. Supp. 1084 (S.D. Ohio, 1996), affirmed without opinion, 178 F.3d 1295 (6th Cir. 1999) (citing Wright, Miller & Cooper, Federal Practice and Procedure: § 1357 at 596 [1969]). The plaintiff satisfied this obligation. This complaint contained direct and inferential factual allegations necessary to sustain recovery under viable legal theory. Id. (citing Car Carriers Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984), cert. denied, 470 U.S. 1054, 84 L. Ed. 2d 821, 105 S. Ct. 1758 (1985) [quoting In re: P1 Moot Antitrust Litigation, 655 F.2d

7

627, 641 (5th Cir. 1981), cert. dismissed, 462 U.S. 1125, 77 L. Ed. 1358, 103 S. Ct. 3100 (1983)]; See also, Sutiff, Inc. v. Donovan Companies, Inc., 727 F.2d 648, 654 (7th Cir. 1984); Wright, Miller & Cooper, Federal Practice and Procedure: § 1216 at 121-23 (1969).

This court should not hold the plaintiff to an impossible high standard. Although she does not have to plead facts in support of every arcane element of her claim, she did not omit any facts that would clearly dominate her case if they existed. See Id. (quoting Steed Farmer Candy Shops, Inc., 859 F.2d 434, 437 (6th Cir. 1988). This court must view the facts in Complaint liberally in favor of the plaintiff and/or non-moving party. See Scheuer v. Rhodes, 461 U.S. 232, 236-40, L. Ed. 2d 90, 94 S. Ct. 1683 (1974). Therefore, this court should deny the defendant's motion for summary judgment because the plaintiff has alleged material facts to support her claims and there are genuine issues of facts that must be presented to the trier of fact for determination.

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate where "there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "In assessing whether judgment as a matter of law is proper, the court must view all evidence and draw all inferences in the light most favorable to the non-moving party." Norville v. Staten Island University Hosp., 196 F.3d 89, 95 (2d Cir. 1999). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial." Id. at 249.

"In determining whether or not there is a genuine factual issue, the court should resolve all ambiguities and draw all reasonable inferences against the moving party." (internal citations omitted.) Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 465 (1989).

"The burden a plaintiff, alleging that he was discriminated against by his employer, carries to survive a summary judgment motion at the prima facie stage is a minimal one." Graham, 230 F.3d at 38. "[T]he plaintiff must establish a prima facie case of discrimination by showing that 1) she is a member of a protected class; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) the action occurred under circumstances giving rise to an inference of discrimination." Norville, 196 F.3d at 95.

**B.  Panolam Is Not Entitled To Judgment As A Matter Of Law As To Plaintiff's Hostile Work Environment Claim (Third Count) Because Plaintiff Can Show That She Was Harrassed Because Of Her Race, Color Or National Origin.**

In the Third Count of the Complaint, Plaintiff alleges that she experienced a hostile work environment in violation of Title VII of the Civil Rights Act of 1964. In support of her claim, Plaintiff alleges that Mr. Hicks and Ms. Bubier followed her through the office, that Ms. Bubier searched her desk, that Mr. Hicks relocated her to a cubicle in a distracting position in the office, that Mr. Hicks did not provide training, and that Mr. Hicks subjected her to profanity at work. (Compl. ¶¶ 28-30; Pl. Depo., pp. 136-150.) Plaintiff also claims that her co-worker, Ms. Bubier failed to give her common courtesy when she first arrived to work in the morning and spoke harshly to her, and that Mr. Hicks told her that she could not speak proper English and at time could not speak at all. (Pl. Depo., pp. 132, 144, 150.) Plaintiff's

9

co-workers of a different race were not treated in this manner. (Pl. Depo., p. 136, 144, 148, 150.)

### 1. Plaintiff Must Present Evidence Of A Hostile, Abusive Work Environment To Avoid Summary Judgment

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." (internal citations omitted.) Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). The hostile working environment must be one "that a reasonable person would find hostile or abusive," and the victim must also perceive the environment to be so. Id. "Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct." Id. at 22.

"A plaintiff may raise such an inference (of discrimination) by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham, 230 F.3d at 39. "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." Norville, 196 F.3d at 95. "In order for employees to be similarly situated for the purposes of establishing a plaintiff's prima facie case, they must have been subject to the same standards governing performance evaluation and discipline." (internal citations omitted) Id. at 96. "A trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue."

10

Gallo v. Prudential Residential Serv.'s, Lim. Partnership, 22 F.3d 1219,1224 (2d Cir. 1994).

Plaintiff's claim in Count Three should not be dismissed because: 1) the incidents related are related to Plaintiff's race, color or national origin; and 2) these alleged incidents do establish the existence of a hostile work environment.

    2.    <u>Plaintiff Can Establish Evidence of Harrassing Or Discriminatory Conduct Related To Her Race, Color Or National Origin</u>

The incidents on which Plaintiff bases her hostile work environment claim establish discriminatory conduct on the part of Mr. Hicks and Ms. Bubier. Plaintiff alleges that she was followed through the office, her desk was searched, her desk was relocated to a distracting position, she was subject to foul language, was accused of not being able to speak proper English and at times not being able to speak at all, and being harassed from the moment she stepped into the office. (Pl. Depo., pp. 132, 137, 150.) The other members of the department were not subject to the same treatment as the Plaintiff and were treated more favorably. (Pl. Depo., pp. 136, 144, 148, 150.) "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham, 230 F.3d at 39.

"The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive." Harris, 510 U.S. at 23. Plaintiff experienced emotional injuries as a result of her disparate treatment such as insomnia, nightmares, domestic interpersonal problems, and bouts of crying. (Pl. Depo., pp.

11

163, 153.) The emotional trauma required professional medical treatment and evidenced an abusive and hostile environment. (Pl. Depo., p. 163.)

      a. <u>There Is Evidence That Plaintiff Was Followed Due To Her Race, Color Or National Origin</u>

There is support for Plaintiff's claim that Mr. Hicks and Ms. Bubier followed through the office due to her race, color or national origin. Plaintiff testified that everywhere she went in the office, "there was always Kathy there, there was al[ways] Jamie there. . . [W]herever I went they would always follow me." (Pl. Depo., p. 135.) Mr. Hicks and Ms. Bubier "didn't do it to the others." (Pl. Depo., p. 135.) "A plaintiff may support an inference of race discrimination by demonstrating that similarly situated employees of a different race were treated more favorably." <u>Norville</u>, 196 F.3d at 95. Plaintiff testified that "[r]ight across from me you would have Suzanne and Michelle. . . [ri]ght next to me you would have Kathy." (Pl. Depo., p.68.) Plaintiff admits that she was not physically with Mr. Hicks, Ms. Bubier, Ms. Gambardella or Ms. Lusteg every minute of the workday, but her desk was in close proximity to theirs ("we worked right next to each other) and Plaintiff never observed Mr. Hicks nor Ms. Bubier follow any other co-worker around the office. (Pl. Depo., p. 135-136.) Plaintiff's evidence shows that Mr. Hicks and Ms. Bubier followed her because of her race, color or national origin, and her claims do support the existence of a hostile work environment under Title VII.

      b. <u>There Is Evidence That Plaintiff's Desk Was Searched Due To Her Race, Color Or National Origin</u>

Plaintiff presents evidence that her desk was searched due to her race, color or

12

national origin. Plaintiff testified that one day she found some of Ms. Bubier's materials mixed in with her papers on her desk and that Mr. Hicks later told her that he had asked Ms. Bubier to search Plaintiff's desk. (Pl. Depo., pp. 151-152.) This invasion of privacy contributed to the many factors comprising a hostile work environment and created a workplace "permeated with discriminatory intimidation. . . and insult that is sufficiently severe or pervasive to alter the conditions of the employment." Harris, 510 U.S. at 21. When Plaintiff asked Ms. Bubier why she was asked to search the desk, Ms. Bubier was evasive and did not answer the question as opposed to offering an explanation such as needing "back-up documentation to address a payment dispute." (Pl. Depo., p. 151; Def. Memoradum p. 15) Plaintiff's claim that her desk was searched when there is no evidence of other co-worker's desks being searched, and no policy in place of routinely searching employees desks contribute to the showing of a hostile work environment.

      c.     <u>There Is Evidence That Plaintiff Was Moved To A New Cubicle Due To Her Race, Color Or National Origin</u>

Plaintiff also claims that Mr. Hicks asked her to move to a new cubicle because of her race, color and national origin. Plaintiff testified that on March 7, 2002, she received an email from Mr. Hicks asking her to move her desk to a place outside his office window. This location, Plaintiff claims, placed her in the walkway of oncoming traffic. (Pl. Depo., p. 148.) This distracting and disturbing work environment interfered with Plaintiff's ability to concentrate and do her work and "interfere[d] with an employee's work performance." Harris, 510 U.S. at 23. Thus, the change in location of Plaintiff's desk demonstrated a hostile

13

working environment.

### d. There Is Evidence That Plaintiff Was Subject To Profanity Due To Her Race, Color Or National Origin

Plaintiff's next claim is that Mr. Hicks used profanity and foul language toward her. Plaintiff was falsely accused of allowing an inappropriate discount for a customer which resulted in Mr. Hicks swearing at the Plaintiff. (Pl. Depo. P. 137.) When the incorrect assumption was discovered, Mr. Hicks didn't apologize for his mistake. (Ex. B, Def. Memorandum ¶ 10.) Plaintiff also claims that Mr. Hicks did not use profanity or foul language in his speech with fellow employees. (Pl. Depo., p. 138.) Plaintiff heard Mr. Hicks' daily interactions with fellow co-workers due to the close proximity of their desks and she never heard Mr. Hicks use profanity directed to any other employee. (Id.) Racial discrimination can be inferred when similarly situated employees are treated more favorably. Graham, 230 F.3d at 39. Mr. Hicks' foul language directed to Plaintiff is evidence of a hostile work environment because any "reasonable person would find [that behavior] hostile or abusive" and the Plaintiff did perceive it to be so. Harris, 510 U.S. at 21, 22.

### d. There Is Evidence That Ms. Bubier Asked Plaintiff Questions Or Spoke Harshly To Her Due To Her Race, Color Or National Origin

Plaintiff also claims that Ms. Bubier created a racially hostile work environment by questioning Plaintiff while she was walking into the office in the morning before she had an opportunity to remove her coat, badgering and speaking harshly to her. (Pl. Depo., pp. 145-151.) This treatment was not experienced by Plaintiff's co-workers, rather they were permitted the common courtesy of putting away their coats and settling in for work for the

14

day. (Pl. Depo., p. 150) The fact that Plaintiff's co-workers were treated more favorably demonstrates and inference of discrimination. Also, facing "the third degree" every morning as one is entering the office, would be viewed by a reasonable person as hostile and abusive, and the Plaintiff viewed it as such. (Pl. Depo., p. 151.)

    e. <u>There Is Evidence That Mr. Hicks' Request That Plaintiff Use Proper English Was Related To Her Race, Color Or National Origin</u>

Plaintiff's final claim is that she experienced a hostile work environment because Mr. Hicks told Plaintiff to speak proper English and accused her of not being able to speak at all in the presence of her co-workers. (Pl. Depo., p. 133.) Plaintiff states that since she is from Jamaica, and when she speaks, "you will hear it come out." (Pl. Depo., p. 134.) Plaintiff stated "That is who I am. That is a part of my race." (<u>Id.</u>) Defendant offers no evidence that other employees or customers complained of being unable to understand the Plaintiff or being confused by her speech. Plaintiff speaks in a particular manner in accord with her race or national origin, and Defendant penalized her for her manner of speech. Thus, Plaintiff is able to provide evidence that Mr. Hicks' statements were discriminatory due to her race and national origin.

    3. <u>Plaintiff's Claims Establish The Existence Of A Hostile Or Abusive Work Environment</u>

Plaintiff's claims do establish the existence of a hostile or abusive work environment. The hostile or abusive working environment must be one that a reasonable person would find hostile or abusive, and the Plaintiff did perceive the situation to be so.

Harris, 510 U.S. at 21, 22. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." (internal citations omitted) Id. at 21. Any reasonable person would, like the Plaintiff, view being sworn at on a daily basis, being followed throughout the office, being badgered from the moment one steps into the office, being rebuked due to one's manner of speech, being relocated to a distracting area to work, being falsely accused of making an error with regard to a discount, and put into a position with only one day of training as an abusive or hostile working environment.

      It is well established that "[t]he trial court's function at this stage is to identify issues to be tried, not decide them, . . . [and] summary judgment is sparingly used where intent and state of mind are at issue because . . . careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." (internal citations omitted) Graham, 230 F.3d at 38. "[I]t is clear enough from our recent cases that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. "It is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." (internal citations omitted) Id. at 248-249.

As Plaintiff can show that she was harassed because of her race, color or national origin, Panolam is not entitled to summary judgment on Plaintiff's hostile work environment claim.

### C. Panolam Is Not Entitled To Summary Judgment As A Matter Of Law On Plaintiff's Discrimination Claim (First Count) Because Plaintiff Can Show That Her Termination Occurred Under Circumstances Giving Rise To An Inference Of Discriminatory Intent.

To establish a claim of race, color or national origin discrimination, Plaintiff must follow the four prong test in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) where Plaintiff must show that: (1) she belonged to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent. *See* Norville, 196 F.3d at 95. Plaintiff can establish a prima facie case of race, color or national origin discrimination because she can show that she is of Jamaican origin, she had prior education and experience in accounting, she was harassed and terminated from her position, and the fact that other white co-workers were treated more favorably and not subject to the same treatment.

"A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." Graham, 230 F.3d at 39. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury," an issue to be resolved at trial. Id. In spite of the fact that this issue should be put before a jury, "a plaintiff must show that her

17

co-employees were subject to the same performance evaluation and discipline standards." <u>Id.</u> at 40. Defendant has failed to provide evidence that Plaintiff's co-workers were subject to a different performance evaluation and discipline standards within the company. Company policies were designed to be applied and followed by all personnel, including the 90 day initial review program for new employees.

Defendant's reason for terminating Plaintiff's employment is a pretext for discrimination. Mr. Hicks never met with Plaintiff to discuss any problems with her performance and Defendant has produced no evidence of signed or acknowledged memos documenting Plaintiff discussions. Rather, Mr. Hicks chose to falsely accuse Plaintiff of making an error, and when the truth was discovered, he failed to issue an apology. (Ex. B Def. Memorandum ¶ 10.) There are genuine issues of material fact as to whether Plaintiff made repetitive errors since none were brought to Plaintiff's attention and on one occasion, Plaintiff was falsely accused. Therefore, Defendant is not entitled to summary judgment because there exist genuine issues of material fact.

> **D.  Panolam Is Not Entitled To Summary Judgment On Plaintiff's Breach Of Contract Claim (Second Count) Because The Letter Identifies A Company Policy With Regard To Employment Offers Which Was Breached.**

In the Second Count of Plaintiff's Complaint, she alleges that Panolam breached the provisions of an employment contract for the Accounts Receivable Clerk position by failing to execute a 90 performance evaluation. (Compl. ¶¶ 26-27.) The offer and acceptance letter dated June 4, 2001 outlined an agreement between Panolam and the Plaintiff. Panolam had

18

agreed to offer the Plaintiff a salary of $30,000 per year, have a 90 review as part of the company's program, and receive a performance evaluation after one year of employment. (Ex. 2 Shea Aff.) Both parties had a "meeting of the minds" on these three items, and thus an agreement was reached. Christensen v. BIC Corp., 18 Conn. App. 451, 458, 558 A.2d 273 (1991). Plaintiff is not pulling one statement out of the agreement; rather, it was understood that all three statements would be included in the offer. Had the Defendant fulfilled the agreement, Plaintiff would have been alerted to any possible problems with her work performance and taken appropriate action thereby preventing any further financial loss. Defendant is not entitled to judgment as a matter of law, because Plaintiff can show that when she accepted the offer of the Defendant, it was with the understanding that these three items would be included in the package.

### E. Panolam Is Not Entitled To Summary Judgment On Plaintiff's Emotional Distress Claim.

Plaintiff alleges that Panolam caused her emotional distress by harassing and intimidating her because of her race, color and national origin. Defendant's conduct during Plaintiff's employment and subsequent termination rose to the level of extreme and outrageous conduct. The swearing and hostility directed toward the Plaintiff in the presence of other co-workers caused the Plaintiff emotional pain to the point where she experienced insomnia, nightmares, domestic problems, and bouts of uncontrolled crying whereby she was forced to seek medical treatment. (Pl. Depo., p. 153.) Therefore, Panolam is not entitled to summary judgment due to there are genuine issues of material fact with regard to their conduct during

19