## STATE OF CONNECTICUT
## COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

| | |
|---|---|
| **Sheron S. Rose** | **CHRO No. 0230431** |
| **Complainant** | |
| | **RESPONDENT'S ANSWER TO COMPLAINT** |
| **Panolam Industries, Inc.** | |
| **Respondent** | |

## ANSWERS TO SCHEDULE A - TERMINATION

1.      When did Complainant's employment at Respondent end?  What was Complainant's last work day at Respondent?

ANSWER:  Complainant's employment ended on March 8, 2002 at approximately 12:30 p.m. March 8, 2002 was Complainant's last work day at Respondent.


2.      When did Complainant first find out that he/she was terminated?

ANSWER:  Complainant first found out that she was terminated on March 8, 2002 at approximately 12:30 p.m.


3.      Who told Complainant that he/she was terminated?  What is that person's name and position at Respondent?

ANSWER:  Mr. Jamie Hicks, Corporate Credit Manager, told Complainant that she was terminated. Sharon Metz, Corporate Human Resources Manager, was present.

4.    Who made the decision to terminate him/her?  What is that person's name, position, and race and color and national origin?

ANSWER:  The decision to terminate the Complainant was made and approved by the following individuals:

    a.    Jamie Hicks, Corporate Credit Manager, White, Canadian;

    b.    Betty Dwyer, Treasurer, White, American;

    c.    Richard Stoll, Director of Finance, White, American; and

    d.    Sharon Metz, Corporate Human Resources Manager, White, American.

5.    For what reason(s) was Complainant's employment terminated?  Be specific.  List all reasons.

ANSWER:  The Complainant was terminated due to her inability to satisfactorily perform her job of Accounts Receivable Clerk.

6.    Was Complainant aware of all the reasons for his/her termination?  If so, how was Complainant made aware of the reasons?  Explain.

ANSWER:  Complainant was aware of her inability to satisfactorily perform her job of Accounts Receivable Clerk, which led to her termination.  The Complainant was made aware of her inability to satisfactorily perform her job through numerous discussions and various meetings that transpired throughout her employment with Respondent.  Please refer to Respondent's Exhibit A attached hereto.

7.    Send copies of all papers, letters, and documents which refer to Complainant's termination. Include, if applicable, all paperwork generated by the Department of Labor (DOL) in processing Complainant's claim for unemployment benefits. DOL paperwork may include decisions, exhibits, and hearing transcripts.

ANSWER:  Please refer to Respondent's Exhibit B attached hereto.


8.    Has anyone else ever done what Complainant did? If so who? When? What is that person's name, position, and race and color and national origin?

ANSWER:  We have had other incumbents in the Accounts Receivable position as well as the Credit Adjustment Clerk position (an equivalent entry-level position within the Credit Department) who also did not satisfactorily perform their jobs.  Please

    a.    Carolyn Whitted, Accounts Receivable Clerk, African American.  Please refer to Respondent's Exhibit D attached hereto.

    b.    Mary LaBounty, Credit Adjustment Clerk, White American.  Please refer to Respondent's Exhibit E attached hereto.


9.    Who was that person's immediate supervisor? What is that supervisor's name, position, and race-color and national origin?

ANSWER:  Jamie Hicks, Corporate Credit Manager, White, Canadian


10.    Was that person terminated? If so, when? On what date?

ANSWER:  Yes.  Carolyn Whitted was terminated on June 6, 2001 and Mary LaBounty was terminated on May 4, 2001.

11.    If that person was terminated, who made the decision to terminate?  What is that

decision-maker's name, position, and race-color and national origin?

ANSWER:  The decision to terminate the above two employees was made and approved by the

following individuals:

    a.    Jamie Hicks, Corporate Credit Manager, White, Canadian;

    b.    Pat Dyer, Director of Finance, White, American;

    c.    Joseph Russo, VP of Human Resources, White, American;

    d.    Paul Hundt, Acting HR Director, White, American; and

    e.    Sharon Metz, Corporate HR Manager, White, American.


12.    If that person was not terminated, why wasn't that person terminated?  Explain.  Compare

that person's situation with Complainant's situation.  Be specific.

ANSWER:  N/A


13.    Has anyone ever done anything as bad as what Complainant did?  In other words, has

anyone else ever done something which had a similar effect on Respondent's business,

which caused a similar harm to Respondent's operations?  If so, who?  When?  What is

that person's name, position and race and color?  And what exactly did that person do?

ANSWER:  Carolyn Whitted was terminated on June 6, 2001 for not satisfactorily performing

her job.  Mary LaBounty was terminated on May 4, 2001 for not satisfactorily performing her

job.  Please refer to the answer to question Number 8.


14.    Who was that person's immediate supervisor?  What is that supervisor's name, position,

and race-color and national origin?

ANSWER:  Jamie Hicks, Corporate Credit Manager, White, Canadian.

4

15.    Was that person terminated? If so, when? On what date?

ANSWER:  Carolyn Whitted was terminated on June 6, 2001 for not satisfactorily performing her job.  Mary LaBounty was terminated on May 4, 2001 for not satisfactorily performing her job.

16.    If that person was terminated, who made the decision to terminate?

      What is that decision-maker's name, position, and race-color and national origin?

ANSWER:

      a.    Jamie Hicks, Corporate Credit Manager, White, Canadian;

      b.    Pat Dyer, Director of Finance, White, American;

      c.    Joseph Russo, VP of Human Resources, White, American;

      d.    Paul Hundt, Acting HR Director, White, American; and

      e.    Sharon Metz, Corporate HR Manager, White, American.

17.    If that person was not terminated, why wasn't that person terminated? Explain.  Compare that person's situation with Complainant's situation.  Be specific.

ANSWER: N/A

18.    In the past 6 months what was Respondent's disciplinary process?

ANSWER:  We do not have a formal disciplinary process.  Our manager's communicate directly to subordinates on an ongoing basis.  If the manager continues to have issues with the employee, the manager will discuss the issues with his/her appropriate supervisor and/or human resources manager to determine the appropriate disciplinary action to be taken.

5

19.    Send copies of any papers or documents which refer to Respondent's disciplinary

process.

ANSWER:  N/A


20.    Before Complainant's termination was he/she disciplined in any way?  If so, when?  By

whom?  For what?  Be specific.  Answer each question.

ANSWER:  Please refer to Respondent's Exhibit A attached hereto.


21.    Send copies of any papers or documents which refer to any discipline that Complainant

received before termination.

ANSWER:  Please refer to Respondent's Exhibit A attached hereto.


22.    For the period two (2) years before 3-8-02 to date list all persons terminated by:

    a.    name

    b.    race-color national origin

    c.    position

    d.    date of termination

    e.    termination decision-maker, and

    f.    reasons for termination

ANSWER:  Please refer to Respondent's Exhibit C attached hereto.

## RESPONDENT'S ANSWERS TO COMPLAINANT'S ALLEGATIONS IN THE COMPLAINT AS AMENDED

The Respondent, Panolam Industries International, Inc. ("Panolam"), herein below answers the allegations as set forth in the Complaint as Amended, in compliance with the Connecticut General Statute Section 46a-83(a):

### Answer To The Complaint As Amended

Allegation No. 1

ANSWER: Panolam admits that Sheron Rose was hired as an Accounts Receivable Clerk at Panolam on June 20, 2001 and was given a red binder (attached hereto as Exhibit G) by Jamie Hicks, and otherwise deny the remaining allegations contained in Paragraph 1, and allege in further response to Paragraph 1 that Mr. Hicks provided Sheron Rose with the red binder, which is basically a print out of the computer screens that Sheron Rose would be using, as reference for cash applications on BPCS software program. The red binder was merely a reference, Mr. Hicks trained Sheron Rose on an ongoing basis and was always available for questions.

Allegation No. 2

ANSWER: Panolam admits the allegations contained in Paragraph 2, and allege in further response to Paragraph 2 that Mr. Hicks continued to train Sheron Rose throughout her employment with Panolam on this software program and was always available for questions, which Mr. Hicks encouraged.

Allegation No. 3

ANSWER: Panolam admits that Michele Gambardella was hired on July 23, 2001 as a Credit Adjustment Clerk, and otherwise deny the remaining allegations contained in Paragraph 3, and

1

allege in further response to Paragraph 3 that Sheron Rose was given the same training as all other persons employed as an Accounts Receivable Clerk at Panolam. Michele Gambardella was hired to replace Pam Harinstein the former Credit Adjustment Clerk (Pam Harinstein left Panolam to attend law school). Since Michele Gambardella was replacing Pam Harinstein as Credit Adjustment Clerk, Pam Harinstein trained Michele Gambardella at her position before Pam left.

Allegation No. 4

ANSWER: Panolam denies the allegations contained in Paragraph 4, and allege in further response to Paragraph 4 that Mr. Hicks treated Sheron Rose in a cordial and professional manner, the same as he treated all other employees.

Allegation No. 5

ANSWER: Panolam denies the allegations contained in Paragraph 5, and allege in further response to Paragraph 5 that Mr. Hicks requested that Sheron Rose use proper grammar (more specifically, to use the proper past, present or future tenses) and write complete sentences, when writing notes on the Aged Trial Balance and descriptions on the sub-ledger adjustments so that all employees in the department could understand what actions Sheron Rose had already taken or planned on taking so that employees referring to these notes on the Aged Trial Balance or descriptions on the sub-ledger adjustments could understand what course of action they needed to take. Please refer to Respondent's Exhibit A. Mr. Hicks also requested that Sheron Rose project her voice better (i.e. speak louder) when talking on the phone to the sales force or customers, this was a common complaint from our sales force, who dealt with Sheron Rose on a regular basis. Mr. Hicks was always available to answer questions or approve work for Sheron

2

Rose and Mr. Hicks treated Sheron Rose in a cordial and professional manner, the same as he treated all other employees.


Allegation No. 6

ANSWER: Panolam denies the allegations contained in Paragraph 6, and allege in further response to Paragraph 6 that Mr. Hicks and Ms. Bubier treated Sheron Rose in a cordial and professional manner, the same as they treated all other employees.


Allegation No. 7

ANSWER: Panolam denies the allegations contained in Paragraph 7, and allege in further response to Paragraph 7 that Mr. Hicks and Ms. Bubier, Credit Analyst, treated Sheron Rose in a cordial and professional manner, the same as they treated all other employees.


Allegation No. 8

ANSWER: Panolam denies the allegations contained in Paragraph 8.


Allegation No. 9

ANSWER: Panolam admits that Ms. Bubier may have had questions for Sheron Rose when she arrived at work, but otherwise deny the remaining allegations contained in Paragraph 9. Ms. Bubier is employed as a Credit Analyst, which basically means she collects money from customers who do not pay their bills. Sheron Rose, as the Accounts Receivable Clerk, was responsible for letting Ms. Bubier know which customers were not paying or were overdue on their account so that Ms. Bubier could proceed to contact those customers to collect the money or stop shipping them anymore product. Ms. Bubier routinely arrives at work around 7:30 a.m.,

3

whereas Sheron Rose routinely would arrive around 8:30 a.m. Ms. Bubier would have had about an hour start on her work for the day before Sheron Rose even arrived and since their positions shared much information, Ms. Bubier may have had questions for Sheron Rose when she did arrive.

Allegation No. 10

ANSWER: Panolam denies the allegations contained in Paragraph 10, and allege in further response to Paragraph 10 that Mr. Hicks treated Sheron Rose in a cordial and professional manner, the same as he treated all other employees.

Allegation No. 11

ANSWER: Panolam admits that the Credit Department was being centralized from the factory in Auburn, Maine to Shelton, Connecticut. There was only one person left in the Credit Department in Auburn, Maine and that person was Ed Rivet who was the Credit Analyst. Mr. Rivet was given the option of moving to Shelton Connecticut as part of this centralization, however Mr. Rivet chose to stay in Auburn Maine. Mr. Rivet's function was essentially similar to that of Ms. Bubier's, Mr. Rivet collected money from high pressure laminate customers (which is manufactured at the plant in Maine and Tennessee) and Ms. Bubier collects money from mainly thermally fused melamine customers (which is manufactured in Canada, Georgia, Oregon, and Tennessee) and sometimes collects money from high pressure laminate customers. When Mr. Rivet decided not to move to Shelton Connecticut, Suzanne Lusteg, an Accounts Receivable Clerk, was promoted to replace to Mr. Rivet as Credit Analyst in Shelton and collect money from high pressure laminate customers. Panolam placed an advertisement in Connecticut Post on February 10, 2002 to hire another Accounts Receivable Clerk to fill Ms. Lusteg's former

4

position. As mentioned before in Answer Number 9, Ms. Bubier and Sheron Rose routinely worked together because Ms. Bubier collected money mostly from thermally fused melamine customers and some high pressure laminate customers and Sheron Rose only monitored thermally fused melamine customer accounts. On the other hand, Ms. Lusteg collected money from only high pressure laminate customers and the new Accounts Receivable Clerk would be monitoring high pressure laminate customer accounts, the same as what Ms. Lusteg used to be responsible for. Furthermore, Michelle Gambardella, a Credit Adjustment Clerk, amongst other things, spends about 50% of her time collecting from high pressure laminate customers. Therefore, after interviewing an applicant for the Accounts Receivable Clerk position that would be monitoring high pressure laminate customers, Mr. Hicks requested that Ms. Lusteg (who collects 100% from high pressure laminate customers), Ms. Gambardella (who collects 50% from high pressure laminate customers), and Ms. Bubier (who collects about 50% from high pressure laminate customers) meet this applicant since that person would be monitoring the same customers. Except as set forth above in Panolam's Answer to Paragraph No. 11, Panolam otherwise denies the remaining allegations contained in Paragraph 11, and further alleges that Mr. Hicks treated Sheron Rose in a cordial and professional manner, the same as they treated all other employees.


Allegation No. 12.

ANSWER: Panolam admits that Sheron Rose was terminated on Friday March 8, 2002, and otherwise deny the remaining allegations contained in Paragraph 12, and allege in further response to Paragraph 12 that Sheron Rose was terminated due to her inability to satisfactorily perform her job of Accounts Receivable Clerk.

5

Allegation No. 13

ANSWER: Panolam admits that as part of the centralization of the Credit Department set forth above in Answer Number 11, Mr. Hicks rearranged everyone's desk in the Credit Department to make it more efficient. This was done over a one week period and everyone in the Department was required to move. Except as set forth above in Panolam's Answer to Paragraph No. 13, Panolam otherwise denies the remaining allegations contained in Paragraph 13, and further alleges that Mr. Hicks treated Sheron Rose in a cordial and professional manner, the same as they treated all other employees.

Allegation No. 14

ANSWER: Panolam admits the allegations contained in Paragraph 14.

Allegation No. 15

ANSWER: Panolam admits the allegations contained in Paragraph 15.

Allegation No. 16

ANSWER: Panolam admits the allegations contained in Paragraph 16.

Allegation No. 17

ANSWER: Panolam admits the allegations contained in Paragraph 17.

Allegation No. 18

ANSWER: Panolam admits the allegations contained in Paragraph 18.

6

Allegation No. 19

ANSWER:  Panolam denies the allegations contained in Paragraph 19, and alleges in further response to Paragraph 19 that Mr. Hicks routinely reviewed with Sheron Rose her job performance.  Please refer to Respondent's Exhibit A.

Allegation No. 20

ANSWER:  Panolam denies the allegations contained in Paragraph 20, and allege in further response to Paragraph 20 that that Mr. Hicks routinely reviewed with Sheron Rose her job performance.  Please refer to Respondent's Exhibit A.

Allegation No. 21

ANSWER:  Panolam admits the allegations contained in Paragraph 21.

Allegation No. 22

ANSWER:  Panolam admits the allegations contained in Paragraph 22.

Allegation No. 23

ANSWER: Panolam admits the allegations contained in Paragraph 23, and allege in further

response to Paragraph 23 that Panolam has 38 employees at 20 Progress Drive in Shelton

Connecticut.


THE RESPONDENT,

PANOLAM INDUSTRIES INTERNATIONAL, INC.


By: _____
Jeffrey M. Muller, Esq.
General Counsel
Connecticut Juris No. 417294
Panolam Industries International, Inc.
20 Progress Drive
Shelton, Connecticut 06484
(203) 225-0054

8