**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-------------------------------x
                                :
SHERON ROSE                     :
                                :
        Plaintiff,              :
                                :    3:02 CV 1806(GLG)
        v.                      :       Opinion
                                :
PANOLAM INDUSTRIES INTERNATIONAL:
INCORPORATED                    :
                                :
        Defendant.              :
                                :
-------------------------------x
```

Pending before the court is defendant's motion for summary judgment on all claims asserted by plaintiff Sheron Rose in her complaint. For the reasons stated below, the court <u>grants</u> defendant's motion for summary judgment (**Doc. #12**) on all five counts.

## I. Procedural History and Facts

On October 11, 2002, plaintiff Sheron Rose filed a five-count complaint against Panolam Industries International Incorporated arising out of her termination of employment with defendant. Plaintiff alleges the following: 1) discrimination based on race, color and ethnic background in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; 2) breach of contract; 3) hostile work environment in violation of Title VII; 4) denial of due process under the 14th Amendment to the United States Constitution; and 5) negligent and intentional infliction of

1

emotional distress.  Plaintiff seeks, inter alia,  both compensatory and punitive damages. (Pl.'s Compl.).

Based on the parties' Local Rule 56(c) statements, the following facts are not in dispute. Defendant manufactures decorative surfaces for use in commercial interiors, store fixtures and other design surfaces. In 1999, defendant purchased Pioneer Plastics and the Pionite High-Pressure Laminate brand. The Panolam and Pionite sides of the business use different systems for pricing and customer information, as well as different accounting software. Pionite uses PeopleSoft and Panolam uses an accounting software called BPCS. (Def.'s Statement at ¶1). In May or June 2001, defendant's Corporate Credit Manager, Jamie Hicks, interviewed plaintiff for a position as an Accounts Receivable Clerk and decided to offer her the job. (Id. at ¶2). On June 4, 2001, Hicks sent plaintiff an offer letter, indicating that her annual salary was $30,000 and that her manager would meet with her as part of a ninety-day initial review program for newly hired employees to evaluate and review her performance. On the top of the second page of her offer letter, there was a disclaimer stating that the letter "is not intended and should not be construed as a contract of employment between you and Panolam." Plaintiff read the disclaimer before she signed the offer letter. (Id. at ¶3). Plaintiff commenced employment on June 20, 2001, and reported to Hicks, who, in turn, reported to the Assistant Treasurer.

2

Aside from plaintiff and Hicks, there were four other employees in the Accounting Department. (Id. at ¶4).

As an accounts receivable clerk, plaintiff was responsible for applying customer payments to the appropriate customer invoice, reconciling bank statements and performing other basic accounting duties.  In performing these duties, plaintiff used a software program called BPCS. Plaintiff also performed cash application duties for the Panolam side of the business. (Id. at ¶5). Plaintiff's co-workers, Suzanne Lusteg and Michelle Gambardella, worked on the Pionite side of the business. Lusteg performed the same type of cash application duties for Pionite as plaintiff did for Panolam. Lusteg and Kathy Bubier, another co-worker, were hired before plaintiff. Gambardella was hired after plaintiff. (Id. at ¶6). As a Rebate Adjustment Clerk, Gambardella, worked with the Marketing Department to apply rebates to customer invoices. Gambardella did not perform cash application duties and worked with a different software program than plaintiff. Gambardella was trained by a former Rebate Adjustment Clerk, who left defendant's employment to attend graduate school. (Id. at ¶7).

On March 8, 2002, Hicks and Sharon Metz, Corporate Human Resources Manager, met with plaintiff and notified her that her employment was being terminated for poor performance. During the meeting, plaintiff was given information regarding the continuation of her medical benefits and applying for

unemployment benefits. The meeting was conducted in a polite, professional manner and ended after the relevant paperwork was reviewed with plaintiff. (Id. at ¶15). After the meeting, Hicks walked with plaintiff to her desk to collect her personal items. No one was present at plaintiff's desk except plaintiff and Hicks. Hicks then escorted plaintiff to the main entrance and plaintiff left the building. (Id. at ¶16).

On March 25, 2002, plaintiff filed a complaint with both the Connecticut Commission on Human Rights and Opportunities ["CHRO"] and the Equal Employment Opportunity Commission ["EEOC"], alleging discrimination based on race, color and ethnic background. On June 24, 2002, the CHRO dismissed plaintiff's charge and on January 17, 2003, the EEOC issued plaintiff a right to sue letter.

## II. Standard of Review

The standard for summary judgement is well established. The moving party is entitled to summary judgment if it demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  "[T]h[e] standard [for granting summary judgment] mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under governing law, there can be but one reasonable conclusion as to the verdict."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

### III. Discussion

A. First Count: Discriminatory Termination

Defendant argues that it is entitled to summary judgment as to plaintiff's discrimination claim in the First Count for termination of employment. In order to establish a prima facie case of discriminatory discharge, plaintiff must show (1) that she belongs to a protected class; (2) that she was performing her duties satisfactorily; (3) that she was discharged; and (4) that her discharge occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that class. See Ramseur v. Chase Manhattan Bank, 865 F.2d 460, 464 (2d Cir. 1989) (racial discrimination in violation of Title VII and 42 U.S.C. § 1981); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184,

1188 (2d Cir.1987) (national origin discrimination in violation of § 1981). Under the McDonnell Douglas framework, after plaintiff has established a prima facie case, the burden shifts to defendant to articulate "a legitimate, nondiscriminatory reason" for its action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). If the employer successfully articulates such a reason, the plaintiff has the burden of proving that the proffered reason is merely a pretext for discrimination. Id. at 143.

    To establish the fourth element of a prima facie case, plaintiff must show that she was treated differently from "similarly situated" co-workers. Mitchell v. Toledo Hosp., 964 F.2d 577, 582 (6th Cir.1992). To be "similarly situated," the individuals with whom plaintiff attempts to compare herself must be similarly situated in all material respects. Id. at 583. Circumstances contributing to a permissible inference of discriminatory intent may include the employer's criticism of the plaintiff's performance in ethnically degrading terms, see Lopez, 831 F.2d at 1189; or its invidious comments about others in the employee's protected group, see Ostrowski v. Atlantic Mutual Insurance Companies, 968 F.2d 171, 182 (2d Cir.1992); or the more favorable treatment of employees not in the protected group, see Washington v. Garrett, 10 F.3d 1421, 1434 (9th Cir.1993) (in a supposed "reduction in force," the plaintiff, a black, was the only person to lose her job).

In the present case, plaintiff claims that she received less favorable treatment than other workers in her department. Specifically, plaintiff alleges that she received less training than a white co-worker, Michelle Gambardella, and that this lack of training led to plaintiff's termination. However, according to the parties' undisputed facts, Gambardella worked as a Rebate Adjustment Clerk, responsible for working with the Marketing Department to apply rebates to customer invoices. (Def.'s Local Statement ¶ 7). Unlike plaintiff, Gambardella did not perform cash application duties; Gambardella also worked with a different software program than plaintiff. (Id.). Gambardella was trained by a former Rebate Adjustment Clerk, who left defendant's employment to attend graduate school. (Id.). At her deposition, plaintiff testified that her supervisor, Jamie Hicks, trained her on her first day, and that he and co-worker Kathy Bubier were available for questions. (Pl.'s Dep. at 84-5). Plaintiff also testified that she did not inform her supervisor that she needed additional training. (Id. at 87). Plaintiff has failed to demonstrate that similarly situated co-workers with comparable jobs were treated differently. Plaintiff's allegations, generously construed, are little more than conclusory statements of no probative value. Accordingly, this court finds that plaintiff has not established a prima facie case of discrimination.

Moreover, even if the court were to assume that

plaintiff established a prima facie case, defendant has offered a legitimate reason for terminating her employment, poor performance. Hicks' affidavit details plaintiff's performance problems and is supplemented by Hicks' diary entries on his computer, a memo to plaintiff regarding her errors with respect to the Bank Reporting Procedure, and a memo to plaintiff's personnel file dated February 13, 2002, detailing a cash application error made by plaintiff.

The court notes that plaintiff has failed to present any evidence, apart from the claim of pretext itself, that suggests discrimination based on race or national origin. Plaintiff argues that defendant's failure to warn her that poor performance could result in termination is evidence of pretext. (Pl. Mem. at 18). This argument is unavailing. First, the record contradicts this assertion. Plaintiff admitted she made errors regarding the Bank Reporting Procedure. (Pl.'s Dep. at 88-90). Although, plaintiff maintains that she did not discuss problems with the Bank Reporting Procedure with Hicks and that she did not receive a memo from him which formalized the discussion between them, she does not otherwise challenge defendant's documentary evidence. (Id. at 92). Second, a mere lack of notice of performance deficiencies is insufficient to defeat summary judgment on a discrimination claim. See Fagan v. New York State Elec. & Gas Corp., 186 F.3d 127, 134-35 (2d cir. 1999) (finding that decision maker's failure to notify plaintiff of

8

performance deficiencies before termination would not allow a rational fact finder to infer that the articulated reason for the termination was a pretext for discrimination); <u>Lapsley v. Columbia Univ.</u>, 999 F.Supp. 506, 521 (S.D.N.Y.1998) (granting summary judgment where defendant had communicated dissatisfaction with plaintiff's work to the Human Resources staff, despite the fact that plaintiff had not received any written evaluations before being terminated).

In the present case, plaintiff has provided no evidence of racial animus towards her. Accordingly, the court grants defendant's motion for summary judgment as to the First Count.

B. Second Count: Breach of Contract

Plaintiff maintains that defendant's offer letter constituted an employment contract which defendant breached when it did not meet with plaintiff for a ninety-day performance review. (Pl.'s Opp. at 18-9). Defendant counters that it had no intent to enter into a contractual relationship, citing the disclaimer language in the offer letter. (Def. Mem. at 30-1). The clause at issue states:

> This letter and offer of employment and any previous or future conversation with any member of the management of Panolam Industries International, Inc. is not intended and should not be construed as a contract of employment between you and Panolam. You have the right to terminate the employment relationship at any time and Panolam reserves the same right.

Under Connecticut law, "[t]o survive a motion for

9

summary judgment, the plaintiff [has] the burden of presenting evidence that the defendant has agreed to some form of contractual commitment. A contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds of the parties." Burnham v. Karl & Gelb, P.C., 50 Conn.App. 385, 388-89, 717 A.2d 811 (1998). Plaintiff's sole evidence is a one-sided reading of the offer letter which allegedly led plaintiff to understand she had formed a contractual relationship with defendant. The disclaimer clause appears at the top of page two and plaintiff does not dispute that she read the disclaimer prior to signing the offer letter on June 20, 2001. (Pl.'s Local Rule 56(a)(2) Statement and Pl.'s Dep. at 157).

As in Burnham, there was not any meeting of the minds between plaintiff and defendant regarding the existence of an employment contract. Accordingly, there are no genuine issues of material fact that a reasonable jury could disagree on under the law. Accordingly, the court grants defendant's motion for summary judgment as to the Second Count.

C. Third Count: Hostile work Environment

Defendant also maintains that the Title VII claims in the Third Count fail as a matter of law because plaintiff did not establish that she was discriminated against on the basis of her race or national origin and subjected to a hostile work environment. (Def.'s Mem. at 11).

In order to prevail on the hostile work environment

10

claim under Title VII, plaintiff must establish two elements: (1) a hostile work environment; and (2) that a specific basis exists for imputing the conduct that created the hostile work environment to the employer.  See <u>Distasio v. Perkin Elmer Corp.</u>, 157 F.3d 55, 62 (2d Cir.1998), and <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir.1997).

To establish the first element--the existence of a hostile work environment plaintiff must prove that the workplace was permeated with "discriminatory intimidation, ridicule, and insult" that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)(internal citations and quotation marks omitted). The hostile environment must be one that a reasonable person would find hostile or abusive, and that the victim did, in fact, perceive to be so. <u>Id</u>. at 21-22. The Supreme Court in <u>Harris</u> held that the courts should look to the totality of the circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance." <u>Id</u>. at 23. The incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 n. 1 (1998)(internal citation and

11

quotation marks omitted). "[O]ne of the critical inquiries in a hostile environment claim must be the environment. Evidence of a general work atmosphere ... --as well as evidence of specific hostility directed toward the plaintiff--is an important factor in evaluating the claim." <u>Perry v. Ethan Allen, Inc</u>., 115 F.3d 143, 149 (2d Cir.1997) (internal quotations and emphasis omitted). The Supreme Court has repeatedly emphasized that simple teasing, offhand comments, and isolated incidents, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. See <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998).

Second, "plaintiff must show that a specific basis exists for imputing the conduct that created the hostile environment to the employer." <u>Perry</u>, 115 F.3d at 149; <u>Murray v. New York Univ. College of Dentistry</u>, 57 F.3d 243, 249 (2d Cir.1995).

However, "employers are presumptively liable for all acts of harassment perpetrated by an employee's supervisor." <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 767 (2d Cir. 1998). To avoid liability, an employer must assert as an affirmative defense, that (1) the employer exercised reasonable care to prevent and promptly correct any harassment by such a supervisor, and (2) the employee unreasonably failed to avail himself of any corrective or preventative opportunities provided by the employer or to

12

avoid harm otherwise. Id.

At her deposition, plaintiff testified that her supervisor, Hicks, told her that she did not speak proper English, that her co-workers often followed her around the office, that she was asked what time she was taking lunch, and that Hicks used profanity on at least one occasion when speaking with her. (Pl.'s Dep. at 134-38). Plaintiff also testified that defendant discriminated against her because she was not trained, whereas a white co-worker, Gambardella, was, and that her supervisor relocated plaintiff to a cubicle in an area in the office where there was more traffic. (Id. at 146-48). Plaintiff further claims that co-worker Bubier once searched her desk, although plaintiff did not know what Bubier was looking for. (Id. at 151-52).

Plaintiff testified that she does not have any facts to link Hicks' language to plaintiff's race, that neither Hicks nor her co-worker, Bubier, used any racial slurs, told any racial jokes, or used any racial stereotypes. (Id. at 139-140). As to the allegation of discriminatory treatment regarding training, plaintiff testified that she did not tell her supervisor that she needed more training. (Id. at 87). Furthermore, plaintiff testified that she did not complain to Sharon Metz in Human Resources about the alleged workplace harassment and discrimination, even though plaintiff assumed that defendant had a policy against discrimination. (Id. at 140-41).

In light of the foregoing, the court concludes that these incidents are insufficient to support a claim of a hostile work environment. Nor did plaintiff alert Human Resources of these incidents. Accordingly, the court grants defendant's motion for summary judgment as to the Third Count.

D. Fourth Count: Denial of Due Process

In the Fourth count, plaintiff alleges she was denied "her constitutional right of substantive due process of law" in violation of the Fourteenth Amendment to the United States Constitution as secured to her under 42 U.S.C. § 1983, which provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . .

"In order to state a Section 1983 claim, plaintiff must allege that she was deprived of a right secured by the Constitution or the laws of the United States and that [defendant] deprived her of this right under color of state law." Page v. Connecticut Dep't of Public Safety, Div. Of State Police, 185 F.Supp.2d 149, 160 (D.Conn.2002) (citation omitted). Defendant maintains that it was not acting under

color of state law and that it is entitled to summary judgment as a matter of law on this claim.

In her Opposition Memorandum, plaintiff does not raise any objections. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." Taylor v. City of New York, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003). Accordingly, the court grants defendant's motion for summary judgment as to the Fourth Count.

E. Fifth Count: Negligent and Intentional Infliction of Emotional Distress

Under Connecticut law, to state a cause of action for intentional infliction of emotional distress, a plaintiff must allege that: (1) the defendant intended or knew that emotional distress would likely result from its conduct; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused plaintiff distress; and (4) that plaintiff's distress was severe. Appleton v. Board of Educ. of Stonington, 254 Conn. 205, 210, 757 A.2d 1059 (2000); Vorvis v. Southern New Eng. Tel. Co., 821 F.Supp. 851, 855 (D.Conn.1993)(citing Petyan v. Ellis, 200 Conn. 243, 253, 510 A.2d 1337 (1986)).

In interpreting what constitutes "extreme and outrageous" conduct, Connecticut courts have relied on the Restatement (Second) of Torts § 46, comment d (1965), which provides: "Liability has been found only where the conduct

has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  See DeLaurentis v. City of New Haven, 220 Conn. 225, 266-67, 597 A.2d 807 (1991); Petyan, 200 Conn. at 254, n. 5. Whether a defendant's conduct rises to the level of being "extreme and outrageous" is a question to be determined by the court in the first instance.  See Johnson v. Chesebrough-Pond's USA Co., 918 F.Supp. 543, 552 (D.Conn.), *aff'd*, 104 F.3d 355 (2d Cir.1996); Appleton, 254 Conn. at 210. "Only where reasonable minds disagree does it become an issue for the jury." Id.

 The threshold issue is whether plaintiff has alleged extreme and outrageous conduct by defendant.  Here, plaintiff alleges that her supervisor, Hicks, told her that she did not speak proper English, that her co-workers often followed her around the office, that she was asked what time she was taking lunch, that Hicks used profanity on at least one instance when speaking with her, that Hicks relocated plaintiff to a cubicle in an area in the office where there was more traffic, and that co-worker Bubier once searched her desk. Plaintiff has failed to allege that any of the actions taken by defendant were done in a manner that was so egregious or oppressive as to rise to the level of extreme and outrageous conduct. No reasonable jury would be permitted to infer that defendant's conduct, as alleged, was

16

sufficiently extreme and outrageous to support a claim for intentional infliction of emotional distress. See Appleton, 254 Conn. at 211; Dobrich v. General Dynamics Corp., 40 F.Supp.2d 90, 104-05 (D.Conn.1999).

   Similarly, plaintiff's complaint fails to state a claim for negligent infliction of emotional distress, which differs from intentional infliction of emotional distress as to the state of mind of the actor, but not as to the conduct claimed to be extreme and outrageous.  See Parsons v. United Technologies Corp., 243 Conn. 66, 88, 700 A.2d 655 (1997). A state law claim for negligent infliction of emotional distress arising in the context of plaintiff's employment requires the plaintiff to plead unreasonable conduct in the termination process. Perodeau v. Hartford, 259 Conn. 729, 762-763, 792 A.2d 752 (2002). Here, the undisputed facts, based on the parties' Local Rule 56 Statements, establish that defendant did not engage in unreasonable conduct in the termination process. On March 8, 2002, Hicks and Sharon Metz, Corporate Human Resources Manager, met with plaintiff and notified her that her employment was being terminated for poor performance. During the meeting, plaintiff was given information regarding the continuation of her medical benefits and applying for unemployment benefits. The meeting was conducted in a polite, professional manner and ended after the relevant paperwork was reviewed with plaintiff. After the meeting, Hicks walked with plaintiff to her desk to

collect her personal items. No one was present at plaintiff's desk except plaintiff and Hicks. Hicks then escorted plaintiff to the main entrance and plaintiff left the building. Therefore, to the extent that the Fifth Count may be read as stating a claim for intentional or negligent infliction of emotional distress, under either scenario, it fails as a matter of law. Accordingly, the court grants defendant's motion for summary judgment as to the Fifth Count.

## IV. CONCLUSION

For the reasons stated above, the court <u>grants</u> defendant's Motion for Summary Judgment (**Doc. #12**) on all claims set forth in plaintiff Sheron Rose's complaint.

SO ORDERED.

Date: February 1, 2004
      Waterbury, Connecticut.

/s/
_____
GERARD L. GOETTEL,
United States District Judge